## DEAN et al. v. CANNON et al.

## In re MULLEN.

(Circuit Court of Appeals, Eighth Circuit.
December 1, 1925.)

### No. 6925.

Bankruptcy ⬤➡340—Evidence held insufficient
to show delivery of unrecorded deed of trust.

In proceeding for allowance of precedence
to an unrecorded deed of trust executed by
bankrupt to protect individual creditor as such
and as guarantor of notes of bankrupt, evi-
dence *held* insufficient to show delivery to al-
leged grantee thereof.

Appeal from the District Court of the
United States for the Eastern District of
Oklahoma; Franklin E. Kennamer, Judge.

In the matter of the estate of J. S. Mul-
len, bankrupt. Proceeding by E. G. Dean,
receiver and liquidating agent of the Farm-
ers' & Merchants' State Bank of Ranger,
and others, against Hal M. Cannon, trustee,
for allowance of precedence to an unre-
corded deed of trust. From a decree sus-
taining objections to allowance of precedence,
claimants appeal. Affirmed.

H. A. Ledbetter, of Ardmore, Okl. (H.
E. Ledbetter, of Ardmore, Okl., W. T. Hen-
ry, Sam A. Leake, and J. W. Gormley, all of
Dallas, Tex., and William M. Hills, of Enid,
Okl., on the brief), for appellants.

Earl Q. Gray, of Ardmore, Okl. (H. C.
Potterf and J. M. Poindexter, both of Ard-
more, Okl., on the brief), for appellees.

Before STONE and VAN VALKEN-
BURGH, Circuit Judges, and PHILLIPS,
District Judge.

STONE, Circuit Judge. This is an ap-
peal from an order or decree sustaining ob-
jections of certain judgment creditors of a
bankrupt to the allowance of a precedence
over their claims to an unrecorded deed of
trust.

A motion to dismiss the appeal has been
filed. As, in our view, the decree should be
affirmed upon the merits, we prefer to place
our decision upon that basis and to pass over
the motion to dismiss.

Appellants are the beneficiaries or the legal
representatives of the beneficiaries in a deed
of trust alleged to have been duly executed
and delivered by the bankrupt. This deed of
trust, covering real estate and an interest in
an oil and gas lease in Oklahoma, was dated
May 20, 1920, and never recorded. Their
rights are based upon this instrument. The
objectors to the allowance of any rights under
such instrument are a grantee of a portion
of the real estate, holders of liens based on
judgments secured and filed of record subse-
quent to the date of the deed of trust and
holders of mortgages, on the same property,
executed subsequent to such date. The vari-
ous objections set forth many reasons why
the objectors urged that this deed of trust
should be held invalid or as ineffective
against their claims. We think it necessary
to discuss but one of such grounds (contained
in all of the objections) which is determina-
tive of the rights presented here. This ground
is that the objectors "deny the execution and
delivery of the purported mortgage."

The referee found that "the genuineness
of this alleged mortgage is extremely doubt-
ful." The court found that the mortgage
was executed but not delivered. Upon an
oral application to modify the findings, the
court found that the mortgage had been ex-
ecuted and that "the court is unable to de-
termine from the evidence whether the mort-
gage referred to was delivered by J. S. Mul-
len, the bankrupt herein, to R. L. Hunt." In
connection with other findings, at this second
hearing, the court said: "The court does not
mean by this finding to imply that he believes
that the mortgage was delivered or was within
the control of R. L. Hunt."

For other reasons, the court concluded
"that the claims of security asserted by the
petitioners should be disallowed for all pur-
poses." The substance of all of these find-
ings upon this matter is that the delivery of
this instrument is left undetermined with an
expressed doubt (by the referee) and a care-
ful reservation (by the court) as to the fact
of delivery thereof. This point has been
strenuously urged in this court. Unbound
by any finding thereon below, we approach
the examination of the evidence relating
thereto. We have examined the entire evi-
dence painstakingly.

This instrument is as follows:

"State of Oklahoma, Carter County.

"Be it remembered, that on this the 20th
day of May, 1920, I, J. S. Mullen, of Ard-
more, Oklahoma, party of the first part, for
one dollar and other good and sufficient con-
sideration, the receipt of which is hereby ac-
knowledged, in hand paid by R. L. Hunt,
party of the second part, hereby assign, sell
and convey unto the said R. L. Hunt, the
following described property:

"A certain tract of land in the NE4 of Sec.
16, Tp. 4 S., R. 2 W., subject to an oil and
gas lease thereon.

"All my interest in an oil and gas lease on the Rexroat land in SW quarter of Sec. 10 and northwest quarter of section 15, Tp. 4 S., R. 2 W.

"All of my interest in the farm lands that I have in Carter county, Oklahoma, except my own allotment as a member of the Choctaw Tribe of Indians.

"I agree later along and on demand of the said R. L. Hunt to furnish a technical description of said lands more in detail.

"I warrant the title to said property subject to taxes, mortgages of record.

"To have and to hold the same unto the said R. L. Hunt, his heirs and assigns. And this instrument is made upon these conditions:

"To guarantee the payment of the following obligations:

"The said R. L. Hunt has caused loans to be secured at the Security National Bank, Dallas, Texas, in the sum of about $35,000, and has morally and perhaps legally guaranteed the payment of the same.

"The said R. L. Hunt has also represented that certain notes evidencing loans to said Mullen or his friends at the American National Bank, Eastland, in the sum of $7,500 (seventy-five hundred dollars) or more to be good and collectible.

"To guarantee the payment of notes at the F. & M. State Bank, Ranger, Texas, one note signed by Goodman and Eaves in the sum of $25,000; one by C. T. Barringer in like amount; a trade acceptance signed by the Universal Petroleum Company for like amount, and reference is made to the notes themselves as to their date and due date, respectively; and any other notes that may come into last-named bank recommended by said Mullen, or that may have already come into said bank recommended by said Mullen.

"This shall apply to all renewals or change of bank.

"If such obligations are paid, this shall be void; otherwise, in full force and effect.

"If the property or any of it herein described has to be used by the said Hunt for the payment of any of said obligations, on the default of the undersigned, the proceeds shall be first applied where the said Hunt is legally liable, if he is legally liable; then next at the American National Bank, Eastland, Texas; then at any other place, especially at the F. & M. State Bank, Ranger, Texas, in the order of their maturities. Before foreclosing this mortgage, on ten days' notice the undersigned shall have the right to substitute other property of equal value for any part of that described herein, but subject to the approval of said Hunt.

"This the 20th day of May, 1920.

"J. S. Mullen.

"State of Oklahoma, Carter County.

"Before me, the undersigned a notary public within and for said county and state, on this the 20th day of May, 1920, appeared personally J. S. Mullen to me known to be the identical person who executed the within and foregoing instrument, and acknowledged to me that he had executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

"Witness my hand and seal the day and year last above written. O. W. Anderton, Notary Public. [Seal.] Com. ex 2—15, 23.

"(Rev. St. $10$10$3.)"

Mullen was adjudicated a bankrupt November 20, 1922. Hunt died March 23, 1923. Mullen was a large operator in lands and oil. His financial dealings were, to say the least, reckless in the extreme. He approximated his debts at $2,000,000 with about one-half that amount of property which was heavily incumbered, many pieces of property having successive mortgages (both recorded and unrecorded) upon them. He drew unstintingly upon his friends' credit through indorsement of his numerous notes. He had an intense animosity toward some of these objectors and ardently desired to see his property used to pay others in preference to them. A month or so before the date of this instrument, he intended to make a mortgage covering much of his property, which would affect such a preference but was restrained by the threat of some of these objectors to throw him into bankruptcy if he should so do. He claims to have executed this mortgage at the date thereof and to have delivered it to R. L. Hunt. He says he drew and typewrote this mortgage himself. He does not remember whether he was in Ardmore, Okl., or in Texas when he made such delivery. Remembers no conversation or understanding with Hunt as to having it recorded. Outside of Hunt and the notary, who took his acknowledgment, he "thinks" he told Mr. Gardenhire, Mr. Butler, Mr. Gray, Mr. Moorman, Mr. Chaffe, Mr. Sturgis and Mr. Hobby about it. Moorman, Sturgis, Chaffe and Gardenhire were called as witnesses. Moorman testifies Mullen told him about the instrument in the summer of 1920. Chaffe claims that Hunt told him, early in 1920, that he had such an instrument. Sturgis and Gardenhire deny any knowledge thereof until about the time of the hearing.

The alleged information of Moorman and Chaffe is purely hearsay and of no probative value. Butler, Gray and Hobby were not called as witnesses nor was their absence accounted for. The notary was not called nor accounted for although he would have been the most natural and the most effective witness to the fact and time of the execution of the instrument. Both Moorman and Chaffe had been employed in enterprises in which Mullen was heavily interested. Mullen did not tell his wife who seems to have been interested in or used by him in some of his transactions. After the date of this instrument, Mullen dealt with and incumbered this property freely on the basis that there was no such instrument. Thereafter, he dealt with some of the beneficiaries thereunder as though no such instrument existed. His private records contained items of many other incumbrances (recorded and unrecorded) on this and other property, but were silent as to this instrument. The beneficiaries thereunder filed claims in the bankruptcy proceeding, making no mention of such security. It was only after these many and devious transactions by Mullen, months after the adjudication in bankruptcy and several months after the death of R. L. Hunt that this paper came to light.

This paper purports to protect Hunt individually and also two banks in which Hunt was or had been an official. Hunt was a graduate of a law school, had practiced law, was a banker and had had the necessity of record of such an instrument drawn to his attention in at least one suit in which he had participated before the date of this instrument. He must have known the danger in holding it from record. Yet, Mullen testifies that Hunt told him he had lost this paper. No demand was made by Hunt for another such instrument. It is, also, to be noted that this instrument is not listed in the bankrupt's schedule of debts and he permitted these beneficiaries to file their claims as general claims and to vote for trustee as general claimants although it was then to their interest to reveal this security which he so much wished them to have and all possible reason for concealment thereof had passed. R. L. Hunt was then alive. The above showing is strong enough to bring into serious question the finding of the court that the instrument was ever executed at the time of its date, but we find it unnecessary to determine that matter.

The evidence as to delivery is even more astonishing. The only evidence thereof is from Mullen and Moorman. Mullen is clearly not worthy of belief and is keenly interested in sustaining the instrument. The evidence by Moorman relates to finding the paper. There is a hint, but only that, in the evidence that Moorman is questionable, but we pass that by. His story of discovery of the instrument is not to be believed. Why he should have been so interested in finding such a paper is not very satisfactorily explained. He says he did so at the request of Sibly, who was vice president of the Security National Bank (one of the beneficiaries under the mortgage), but Sibly is not produced as a witness. He says he went to see Dick Hunt, brother of R. L. Hunt, and had him look among the papers of R. L. Hunt "at Mexia, Ranger and around." This search was without success "and finally he and I went together and found the mortgage in the office of D. G. Hunt, father of R. L. Hunt." Dick Hunt is not produced as a witness, although his testimony would have been of evident vital value and although his whereabouts are shown to have been known. The story of Moorman is that he and Dick Hunt went to Hunt's father's office and that he found the paper in "fifteen or twenty minutes * * * in a drawer or pigeon hole of a desk." Although the father, D. G. Hunt, had told them the paper was not there, neither of them ever told him that they had found it.

After completing a law course, R. L. Hunt came into the office of his father where he remained about a year. He left the office in 1918, going into the banking business. The father was a witness. His testimony has the ring of truth in it. He swears there were no papers in his office belonging to his son after his son went to Ranger (in 1918) to go into the bank there. Moorman testified that he found this paper "thirty or sixty days" before he testified, on July 14, 1923. R. L. Hunt had died March 23, 1923. The father had made two searches of all of the papers in the office looking for certain tax receipts. One of these searches was about the 18th or 20th of January, 1923, and the other after the death of his son. The thorough character of these searches is revealed by extracts from his testimony. As to the first search he says:

"After receipt of this notice I took a day off and I examined carefully and painstakingly every paper, envelope and instrument in my office trying to find the receipt for those taxes. I even went through my monthly bank statements for those years and I took the checks out and read them one by one.

I tried to find if I hadn't paid that tax. I didn't find it nor did I find that instrument."

As to the second search, he says:

"I went through every receptacle in the office and every envelope in the office that could have contained such a paper."

This instrument was stamped with three revenue stamps, two for $10 each and one for $3. It would naturally have attracted the attention of a lawyer searching among his own papers. The father says it "would have attracted my attention, of course." He never saw the paper. Also, although he saw his son (R. L. Hunt) almost daily for more than a year before his death, he never heard of such an instrument until after the death of his son. With all of this evidence in the record, even if unaffected by the suspicious absence from the trial of the notary and of Dick Hunt, this court finds it too great a stretch upon its credulity to believe that this instrument was found in that office. We must conclude that it was not there. We find no credible testimony in this record of any delivery of this instrument to R. L. Hunt and determine that issue of fact in favor of the objectors. The legal result of this determination is that the court was right in concluding that this "claim of security asserted by the petitioners should be disallowed for all purposes."

On the merits, the decree should be and is affirmed.